PALM BEACH ISLES ASSOCIATES, a
Florida Partnership; Martin Slifka, in-
dividually and as trustee; Marjorie Mar-
golis and Roberta Franklin, individuals
as tenants in common; and the Estate
of Joseph Slifka, represented by Alan
Slifka and Barbara J. Slifka, co-execu-
tors, Plaintiffs,

v.

UNITED STATES, Defendant.

No. 93–654L.

United States Court of Federal Claims.

Oct. 19, 1998.

Luther M. Taylor, Palm Beach Gardens, Florida, attorney of record for plaintiffs, with whom was Michael M. Ryan, of counsel.

Joel D. Armstrong, Environmental & Natural Resources Division, Department of Justice, Washington, D.C., with whom was Lois J. Schiffer, the Assistant Attorney General, attorneys of record for the defendant. Dorothy L. Boardman, U.S. Army Corps of Engineers, of counsel.

## OPINION

HORN, Judge.

The above-captioned case comes before this court on the parties cross-motions for summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC). The plaintiffs are the alleged equitable and legal title holders of 50.7 acres of real property primarily (with the exception of 1.4 acres) existing as submerged land below the mean high water mark (49.3 acres) located in the City of Riviera Beach, Palm Beach County, Florida. The plaintiffs filed a complaint [1] against the

---

1. Initially, the plaintiffs filed a complaint solely in the name of Palm Beach Isles Associates, a Florida partnership (Palm Beach Isles). The defendant challenged Palm Beach Isles' ownership of the property at issue, in pleadings submitted and at oral argument, arguing that Palm Beach Isles did not "own the property at the time of the permit denial." Subsequently, the complaint was amended to indicate that Palm Beach Isles maintained equitable title to the property at issue and to include the parties with legal title to the property. Those parties pleaded to have legal title are Martin Slifka, individually and as trustee; Marjorie Margolis and Roberta Franklin, individuals as tenants in common; and the Estate

of Joseph Slifka, represented by Alan Slifka and Barbara J. Slifka, co-executors. Since the initiation of this litigation, this court attempted in numerous orders and at status conferences to elicit verified information, that could be stipulated to, from the parties as to legal ownership of Palm Beach Isles. It was not until July 9, 1996, that the parties submitted stipulations of fact defining the legal title ownership interests of the plaintiffs in the subject property. This submission, along with the amendment to the complaint defining the parties at interest, resolved the questions of ownership interests to which the defendant had devoted extensive attention in its arguments.

United States seeking compensation in excess of $10,000,000.00 for an alleged taking. Plaintiffs claim that when the United States Army Corps of Engineers (the Corps) denied a dredge and fill permit for the property the defendant took plaintiffs' property without just compensation in violation of the Fifth Amendment to the United States Constitution.

## FACTS

The property in dispute consists of a 50.7 acre parcel of land located in the City of Riviera Beach, Palm Beach County, Florida.[2] On April 20, 1956, Frank Smith, Martin Slifka, and Joseph Slifka acquired a 311.7 acre parcel of property, including the 50.7 acres at issue in this action, from the West India Fruit & Steamship Company for a total purchase price of $380,190.00.[3] Shortly thereafter, the plaintiffs purchased fill material from the Trustees of the Internal Improvement Trust Fund of the State of Florida to be used in the development of the property.[4] Frank Smith, Martin Slifka, and Joseph Slifka subsequently transferred a one-quarter interest in the 311.7 acre parcel to Morris Brown on June 18, 1957.

The deed for the original, complete 311.7 acre parcel purchased by the plaintiffs in 1956 indicates that the tract straddled the A-1-A, a road also known as State Road No. 703, with the property bordered on the "east by the waters of the Atlantic Ocean [and] on the west by the waters of Lake Worth" inclu-

sive of "submerged lands in Lake Worth." The plaintiffs later sold the bulk of upland property located on the oceanfront or eastern side of A-1-A, while retaining ownership of the 50.7 acres currently in dispute, which are predominantly "submerged lands" abutting a narrow strip of wetlands shoreline on the eastern shore of Lake Worth.

Lake Worth is a long, narrow lake lying in a north to south configuration. A narrow upland ridge separates Lake Worth from the Atlantic Ocean. In the 1 860's, an opening was cut in the upland ridge connecting Lake Worth to the Atlantic Ocean; consequently, the lake changed from freshwater to a marine water basin. Lake Worth now supports a healthy and diverse population of marine and estuarine flora and fauna. In addition, Lake Worth serves as a segment of the Atlantic Intracoastal Waterway.[5] The dredged Intracoastal Waterway channel lies to the west of the plaintiff's land further into the waters of Lake Worth.

On July 26, 1957, the Corps granted Frank Smith a permit to construct a bulkhead and to dredge and fill the property, located within Lake Worth and the focus of the instant action. The permit was set to expire on December 31, 1960, but prior to expiration was extended through December 31, 1963. The plaintiffs had intended to fill the submerged property at the time of the permit application to develop single-family residen-

2. In making its findings of fact, this court relies, in part, upon the agreed upon facts derived from the plaintiffs' "Proposed Findings of Fact;" the defendant's "Proposed Findings of Uncontroverted Fact;" and the plaintiffs' "Amended Proposed Findings of Uncontroverted Fact." This reliance is based on the oral stipulation of both parties at oral argument following a detailed discussion in an effort to unscramble the confusing submissions. In addition, over a year, later the parties filed a joint submission defining the ownership interests of the subject property. The filings in the case consistently have been submitted by plaintiffs' counsel in the improper format and it has been difficult to resolve outstanding issues of fact, despite the plaintiffs' consistent contention that this case should be resolved on summary judgment.

3. In 1956, Frank Smith, Martin Slifka, and Joseph Slifka purchased a parcel approximately

one mile south of the 311.7 acre parcel of property. This southern parcel was developed into 191 lots, which were sold over a period of approximately ten years. This action has no direct connection to that development.

4. The parties stipulated that the plaintiff purchased fill from the Trustees of the Internal Improvement Trust Fund of the State of Florida in 1956; however, it appears from the exhibits attached to the plaintiffs' motion for summary judgment that the transaction for 390,000 yards of fill occurred on July 16, 1957.

5. The Atlantic Intracoastal Waterway is defined in 33 U.S.C. § 1804 (1994) as "[t]wo inland water routes approximately paralleling the Atlantic coast between Norfolk, Virginia and Miami, Florida for 1,192 miles via both the Albermarle and Chesapeake Canal and Great Dismal Swamp Canal routes."

tial lots; however, no work was undertaken pursuant to the 1957 permit.[6]

On September 19, 1968, the plaintiffs [7] sold the 261–acre upland oceanfront portion of the 311.7 acre parcel of property eastward of the A–1–A to Shell Oil Company for approximately $1,000,000.00. The plaintiffs, thus, retained ownership of 50.7 acres, consisting of 49.3 acres of lake bottom that is below the mean high water mark, and 1.4 acres of adjoining shoreline of red mangrove/salt-marsh cordgrass wetlands, bordering along the A–1–A for some 2000 feet, that is above the mean high water mark.[8] On November 18, 1988, Palm Beach Isles filed a permit application with the State of Florida Department of Environmental Regulation (DER) to dredge and fill the 50.7 acres of lake bottom and adjoining red mangrove/salt marsh cordgrass wetlands shoreline.

The DER, upon reviewing Palm Beach Isles' proposed development, found that the development would: eliminate 50.7 acres of healthy and productive estuarine wetland and submerged habitat in Lake Worth; degrade water quality; impact hydrologic flow conditions in the area adversely affecting navigation; and set a precedent for similar development further eliminating the natural resources of Lake Worth. Therefore, the DER denied Palm Beach Isles' permit application on April 13, 1990, with a caveat in the denial notice that "a design incorporating features resulting in minimal environmental impact such as docks and boardwalks, could be pursued."

Specifically, the DER noted in its background discussion on the proposed development project that:

The field appraisal of the project was conducted by the Department on November 27, 1989.

The proposed project is to be constructed on a 50.7 ac. parcel, the majority of which is submerged land in Lake Worth immediately west of A1A between Singer Island on the east and the Village of North Palm Beach on the west. The section of Lake Worth in which the project is located is immediately southeast of Big Munyon Island and shares a common border with the John D. MacArthur Beach State Park along the northern property boundary.

The area surrounding the project site is highly urbanized with much of the shoreline of Lake Worth being developed and seawalled with the exception of the state park and a few additional parcels south of the project area.

The property itself is comprised of 1.4 ac. of land above the mean high water line which consists of an approximately 2,000 linear ft. fringe of shoreline along the eastern property line between A1A and Lake Worth. The remaining 49.3 ac. are below the mean high water line, the boundaries of which form an irregularly shaped polygon within Lake Worth.

The shoreline fringe currently supports all three species of mangroves, *Rhizophora mangle* (red mangrove), *Leguncularia ra-*

---

6. At a deposition of Mr. Martin Slifka on September 12, 1994, upon questioning by government counsel, Mr. Slifka stated the reason for the plaintiffs' decision to not develop the submerged land at issue in the instant case:

Q. Why wasn't it developed when you had the permit in '57?
A. Well, we can only develop one piece at a time and we did the southern piece. We had intention of developing the northern piece after the southern piece was finished and sold. It took approximately ten years to sell that property on the—to sell 191 lots on the southern piece called Palm Beach Isles, and by that time the partners decided that the absorption rate for that kind of property on the water was very poor, so we decided not to develop the northern piece.
Q. When was that that you decided not to develop the northern piece?

A. About—the northern piece, '67.

7. As of 1968, the ownership interests in the property were: one-quarter interest held by Frank Smith; one-quarter interest held by Martin Slifka; one-quarter interest held by Joseph Slifka; and one-quarter interest held by Pearl Brown, Ely Margolis and Gerald Franklin, as Trustees of Last Will and Testament of Morris Brown.

8. Plaintiffs' February 8, 1990 response to the Corps' public notice process, concerning the project Palm Beach Isles intended to develop, discusses the nature of the property the plaintiffs retained: "The proposed site consists almost entirely of submerged lands.... The only transitional and upland areas of the site consist of a thin strip along the eastern property line adjacent to State Road 703."

*cemosa* (white mangrove), and *Avicennia germinans* (black mangrove) as well as *Sesuvium* sp. (sea purslane), *Borrichia frutescens* (sea-oxeye) and *Spartina* sp. (cordgrass). Upland of these are *Coccoloba uvifera* (sea grape) and *Schinus terebinthifolius* (Brazilian pepper).

The remaining acreage consists of shallow gradually sloping mud-flat, varying in depth from 0 to –4 ft. MLW [mean low water]. A biological study of the submerged area supplied by the applicant noted that approximately 38.61 ac. currently support seagrasses. Dense shoal grass, *Halodule wrightii*, occurs in the intertidal zone and beyond, while the deeper zones support mixed beds of *Halophila* spp., *Thalassia testudinum* (turtle-grass), *Syringodium filiforme* (manatee-grass) as well as a variety of algal species.

A number of animal species were also noted utilizing the area on the date of the site inspection. At low tide extensive areas of exposed and submerged mudflat were covered with grazing mollusks. Additionally, Florida grass shrimp (*Palaemon floridana*), blue crab, (*Callinectes sapidus*), horseshoe crabs (*Limulus polyphemus*), hermit crabs and other invertebrates were noted in this area. Invertebrate egg masses and burrows, blue crabs, stone crabs (*Menippe mercenaria*), large schools of small fish, checkered puffers (*Sphoeroides testudineus*) and spider crabs (*Libina* sp.) all occur in the extensive seagrass beds in the deeper portions of the project area.

The DER articulated the following reasons for the denial of the plaintiffs' request to dredge and fill the land submerged in Lake Worth along with the abutting shoreline:

The proposed project is expected to result in the elimination of 50.7 ac. of healthy and productive estuarine wetland and submerged habitat in Lake Worth. Seagrass and algae beds as currently exist in the project area have been well documented as important resources which provide a variety of important functions in the estuarine community including providing refuge and nursery areas for small invertebrates and numerous fish species, providing substrate for epiphytic algae on which these species graze, providing foraging areas for larger fish, invertebrates and wading birds, stabilizing sediments which benefits water quality, and recycling nutrients bound in the sediments. In addition, the seagrasses themselves are an important food for the endangered manatee (*Trichechus manatus*) which are known to occur in Lake Worth.

The shoreline fringe of mangroves and nonvegetated mud flats are also extremely important and productive components of this system, providing detrital export, and habitat and foraging areas for numerous species of wildlife, including a considerable number of species of wading birds. Loss of this habitat is expected to have a severe impact on local populations of wildlife.

The Department has also reviewed the hydrographic characteristics in the area and the expected effects of the project on water quality and flow conditions. As proposed, the project is expected to interrupt littoral transport in the general project area and as a result, downdrift erosion is expected to occur south of the project area and could be a serious problem in time. In addition, changing of the horizontal flow field in the near shore area is expected to occur resulting in backwater dead zones on the north and south sides of the project due to the blocking/shadow effect of the proposed land mass. This interruption of flow patterns and blocking effects are expected to cause a degradation of water quality in the project area due to increased residence times and material accumulation in the dead zones noted above.

Finally, the Department has considered the cumulative impacts that could be expected to result from permit issuance, pursuant to Section 403.919, Florida Statutes. The previous dredging and filling activities and associated seawalling which have taken place in Lake Worth have eliminated a majority of the productive salt marsh wetland and shallow submerged communities which historically occurred in this area. Issuance of a permit for this project would not only eliminate a considerable acreage of wetland and submerged land but would

set a precedent for similar development on other privately owned submerged property known to occur south of the project, further eliminating what remains of the natural resources of Lake Worth.

As a result of the above cited factors, degradation of water quality in Lake Worth is expected. The applicant has not provided reasonable assurance that the immediate and long-term impacts of the project will not result in the violation of water quality standards pursuant to Florida Administrative Code Rules 17–312.150(3) and 17–312.070. Specific State Water Quality Standards in Florida Administrative Code Rules 17–3.051, 17–3.061 and 17–3.121 ... will be affected by the completion of the project....

 * * * * * *

This project will also result in the following matters which are contrary to the public interest pursuant to Section 403.918(2), Florida Statutes:

a. adversely affect the conservation of fish and wildlife, including endangered or threatened species, or their habitats;

b. adversely affect navigation or the flow of water or cause harmful erosion or shoaling;

c. adversely affect the fishing or recreational values or marine productivity in the vicinity of the project;

d. is permanent in nature;

e. diminish the current condition and relative value of functions being performed by areas affected by the proposed activity.

Therefore, the applicant has not provided reasonable assurance that the project is not contrary to the public interest pursuant to Section 403.918(2), Florida Statutes.

In denying the permit, the Department notes that the applicants deed from the Trustees of the Internal Improvement Trust Fund may confer an independent right to fill the property. The Department offers no opinion concerning the validity or extent of any such right, but waives the water quality certification required by Public Law 92–500 as a prerequisite for federal dredge and fill permits.

Thirty-two years after the first permit application, on May 31, 1989, the Corps received a permit application from Palm Beach Isles pursuant to section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. §§ 401–467 (1988), and section 404 of the Clean Water Act, 33 U.S.C. §§ 1251–1387 (1988). The application sought permission to fill the 49.3 acres of lake bottom and 1.4 acres of adjoining red mangrove/saltmarsh cordgrass wetlands shoreline, for the purpose of constructing a residential development. At the time of the 1989 application to the Corps, these 49.3 acres of lake bottom were below the mean high water mark, and would have to be filled to a height of five feet above the mean low water level to accommodate development.

In processing Palm Beach Isles' permit application, the Corps completed an environmental assessment, issued a public notice for comment, and received comments from a number of other governmental agencies. The Environmental Protection Agency, the Fish and Wildlife Service, and the National Marine Fisheries Service recommended that the permit be denied. The DER expressly waived, as required by state law, the water quality certification required as a prerequisite for a permit by the Corps to dredge and fill. A permit application was not submitted to the City of Riviera Beach, Florida, yet, the city in a letter to the Corps stated that it "strongly oppos[es] such a request to fill approximately 50 acres of submerged lake bottom in Lake Worth." An application for the proposed development was submitted to the Palm Beach County Department of Environmental Resources Management, but the application was withdrawn before the Department rendered a decision. Notwithstanding the withdrawal of the application, the Board of County Commissioners, Palm Beach County, passed a resolution declaring that the filling of 50 acres of seagrass habitat would be contrary to the public interest. The Corps transmitted the comments it had received to Palm Beach Isles on January 12, 1990, and invited its response to the concerns identified.

The plaintiffs responded to the comments and concerns on February 8, 1990. As to the concerns raised by Palm Beach County

Department of Environmental Resources Management, the City of Riviera Beach, Department of Community Development and Environmental Control, and other groups and federal agencies, the plaintiffs recognized that "the construction of the proposed project will result in the loss of a natural resource from which the public currently benefits." Palm Beach Isles also stated that the "[c]ompensating public benefit however is derived from an increase in the tax base." In addition, Palm Beach Isles replied to the numerous public interest concerns by emphasizing that zoning for the property only permits "single family residential" land use and not "water dependant uses such as marinas." [9] The plaintiffs also emphasized that "the subject property comprises the extent of the applicant's holdings. No other site is available to the applicant for the proposed use or alternative uses." In closing, Palm Beach Isles informed the Corps that "[t]he site plan finally selected represented the most favorable balance of impacts on the environment vs. economic return to the applicant."

The Corps denied Palm Beach's permit application on May 16, 1990.[10] The cover letter accompanying the denial by the Corps stated:

The evaluation of your proposal has been completed and it has been determined that the issuance of the permit is contrary to the 404(b)(1) guidelines and contrary to the public interest. The project would result in the elimination of 50.7

acres of important Lake Worth shallow water habitat.

Based on the evaluation of all pertinent facts in the file, the permit to fill 50.7 acres of Lake Worth shallow water habitat is hereby denied.

The Corps found that the proposed development would adversely effect, but not likely jeopardize the continued existence of the endangered West Indian (Florida) manatee. The permit denial, however, was based on a number of factors including conservation, economics, environmental, wetlands, fish and wildlife, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, safety, and others. In addition, the Corps found that Palm Beach Isles had failed to demonstrate that no other alternatives were available because other areas in Palm Beach County could have been used for this proposed development. Notably, the Corps addressed the direct impact upon navigation:

(11) Navigation: Shallow water depths that already exist in the proposed project area have limited boating activities to shallow draft vessels. Therefore, other than the elimination of 48.4 acres [11] of navigable waters, the project should not have a significant adverse impact on navigation, in general.

Donald Borda, a Corps Regulatory Specialist and the Senior Project Manager who prepared the Corps permit denial, further explained, in a signed declaration dated December 21, 1994, which is part of the record,

---

9. Notably, despite the repeated references by plaintiffs that no alternative uses are available, there is no indication in the record that the plaintiffs attempted to seek a zoning change or land use exemption from the city, county or state for a marina or any other purpose. Nor is there any evidence in the numerous permit and application documents attached to the summary judgment pleadings indicating any attempt by the plaintiffs to seek a zoning variance. Moreover, the DER specifically stated that "a design incorporating features resulting in minimal environmental impact, such as docks and boardwalks, could be pursued."

10. According to the joint stipulation of the parties, as of the date of the permit denial by the Corps, May 16, 1990, the ownership interests in the property were: one-quarter interest held by

Thelma Smith; one-quarter interest held by Martin Slifka; one-quarter interest held by Joseph Slifka; and one-quarter interest held by Pearl Brown, Ely Margolis and Gerald Franklin, as Trustees of Last Will and Testament of Morris Brown. It appears from documents attached to defendant's motion to dismiss that, in August 1986, Martin Slifka acquired Thelma Smith's one-quarter interest in the property for $1,500.00.

11. While the Corps delineated 48.4 acres as navigable waters, the parties stipulated that 49.3 acres of the property at issue exist below the mean high water mark. At oral argument before this court plaintiffs' counsel stated that "[a]bout 49.3 acres" were submerged lands below the mean high water mark.

the impact of the plaintiffs' proposed project upon navigation:

On pages 12 and 13, Item (11), Navigation, I state, "Shallow water depths that already exist in the proposed project area have limited boating activities to shallow draft vessels. Therefore, other than the elimination of [49.3] acres of navigable waters, the project should not have a significant adverse impact on navigation, in general." It is important to clarify that I was referring, there, solely to navigation in the broad sense of the commercial or recreational vessels that utilize the adjacent federal navigation channel (Intracoastal Waterway) and that travel in deeper waters. While the proposed fill might not have a significant adverse effect upon the ability of such vessels to move in the federal channel (although it could cause some shoaling of the channel and/or changes in quantity, quality, and direction of flow of the waters), the proposed fill would certainly have an adverse effect on shallow draft vessels that utilize the shallower areas by eliminating over 49 acres of these shallows and by altering the course, location, condition, and capacity of [the] entire waterbody.

The aforementioned statement at pages 12 and 13, Item (11), Navigation, should not be interpreted to mean that the proposed filling would not have a significant adverse impact on "navigable waters of the United States" under § 10 of the Rivers and Harbors Act of 1899 ("RHA"), 33 U.S.C. § 403, as defined in 33 C.F.R. Part 329. The fill would, without doubt, have a significant adverse affect [sic] upon the entire waterbody by altering or modifying the course, location, condition, or capacity of the lake and the navigation channel, in violation [of the] RHA § 10. This is one of the principal reasons the permit was denied.

Subsequently, the plaintiffs filed a declaratory judgment action in the Circuit Court of the Fifteenth Judicial Circuit, Palm Beach County, Florida against the DER and the Trustees of the Internal Improvement Trust Fund of the State of Florida. On October 9, 1991, Palm Beach Isles and the DER signed a proposed stipulation for the purpose of settling that declaratory judgment action, which was approved by Judge James T. Carlisle of the Florida Circuit Court on November 18, 1991. *Palm Beach Isles Associates, et al. v. State of Florida Dep't of Envtl. Regulation and Trustees of the Internal Improvement Trust Fund of the State of Florida*, Case No. 90–7742 AJ, (Fla.Cir.Ct., Palm Beach County, November 18, 1991) (Carlisle, J., final judgment). The final judgment stipulated that the Trustees of the Internal Improvement Trust Fund of the State of Florida deed upon which Palm Beach Isles derives title was valid and the plaintiffs' right to bulkhead and fill the 50.7 acres of property was not subject to regulation by the State of Florida. This stipulation also dictated that Trustees of the Internal Improvement Trust Fund of the State of Florida, the State of Florida Department of Natural Resources, and DER "will not interfere with [Palm Beach Isles'] attempts to procure a permit to dredge and fill the subject lands from the U.S. Army Corps of Engineers."

The parties have stipulated that the Corps' denial of the plaintiffs' request for a permit, to dredge and fill the property at issue in this case, constituted final agency action. At oral argument, the plaintiffs' counsel conceded that, at the time of the application for the Corps dredge and fill permit, they were aware of the navigational servitude rights of the United States over the property at issue.[12] The United States has not purchased

---

12. The following colloquy occurred between the court and plaintiffs' counsel regarding the plaintiffs' knowledge of the government's navigational servitude over the submerged lands:

THE COURT: ... But much more serious to the liability issues seems to me the question of the navigability of the water is at issue here. And I'm not sure I understand from the briefings that I've read and looked at, whether or not the plaintiff knew that the lake bottom portion of the parcel was considered navigable water.

At the time that the permit application was actually submitted, did the relevant plaintiffs know of that at the time of the application submission or not?

MR. TAYLOR: Yes.... Now [the plaintiffs ha]ve always filed for permits and gone through the permit process. And they've always known and they've always known in deal-

or otherwise acquired an interest in the 50.7 acres of land submerged in the water of Lake Worth.

## DISCUSSION

The parties have filed cross-motions for summary judgment pursuant to RCFC 56 on plaintiff's claim that the actions by the Corps constituted a taking in violation of the Fifth Amendment to the United States Constitution. Summary judgment in this court should be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56 of the Rules of the Court of Federal Claims (RCFC) is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar in language and effect.[13] Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

RCFC 56(c) provides that in order for a motion for summary judgment to be granted, the moving party bears the burden of demonstrating that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Creppel v. United States*, 41 F.3d 627, 630–31 (Fed.Cir.1994); *Meyers v. Asics Corp.*, 974 F.2d 1304, 1306 (Fed.Cir.1992); *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States*, 20 Cl.Ct. 674, 679 (1990), *aff'd*, 944 F.2d 885 (Fed.Cir.1991); *Rust Communications Group, Inc. v. United States*, 20 Cl.Ct. 392, 394 (1990). Disputes over facts which are not outcome determinative under the govern-

ing law will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury [trier of fact] could return a verdict for the nonmoving party." *Id.; see also Uniq Computer Corp. v. United States*, 20 Cl.Ct. 222, 228–29 (1990).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Cloutier v. United States*, 19 Cl.Ct. 326, 328 (1990), *aff'd*, 937 F.2d 622 (Fed.Cir.1991). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250–52, 106 S.Ct. 2505. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Stated otherwise, if the nonmoving party cannot present evidence to support its case under any scenario, then there should be no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

If, however, the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in

---

ing in South Florida that the United States government up and down the int[ra]coastal [waterway] has all these servitude rights. All these rights. . . .

THE COURT: . . . Do you dispute that this was considered navigable water?

MR. TAYLOR: My answer is yes, this is navigable water. . . .

13. In general, the rules of this court are patterned on the Federal Rules of Civil Procedure.

Therefore, precedent under the Federal Rules of Civil Procedure is relevant to interpreting the rules of this court, including RCFC 56. *See Jay v. Sec'y DHHS*, 998 F.2d 979, 982 (Fed.Cir.1993); *Imperial Van Lines Int'l, Inc. v. United States*, 821 F.2d 634, 637 (Fed.Cir.1987); *Lichtefeld–Massaro, Inc. v. United States*, 17 Cl.Ct. 67, 70 (1989).

favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Id.; see also Litton Indus. Prods., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 163 (Fed.Cir.1985); *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

The initial burden on the party moving for summary judgment, to produce evidence showing the absence of a genuine issue of material fact, may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Lima Surgical Assocs.,* 20 Cl.Ct. at 679. If the moving party makes such a showing, the burden then shifts to the nonmoving party to demonstrate that a genuine factual dispute exists by presenting evidence which establishes the existence of an element of its case upon which it bears the burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. 2548; *Lima Surgical Assocs.,* 20 Cl.Ct. at 679.

Pursuant to RCFC 56, the motion for summary judgment may succeed, whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. 2548. Generally, however, in order to prevail by demonstrating that a genuine issue for trial exists, the nonmoving party will need to go beyond the pleadings, by use of evidence such as affidavits, depositions, answers to interrogatories, and admissions. *Id.*

The fact that both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, however, does not relieve the court of its responsibility to determine the appropriateness of summary disposition in the particular case. *Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987)). "[S]imply because both parties moved for summary judgment, it does not follow that summary judgment should be granted one or the other." *LewRon Television, Inc. v. D.H. Overmyer*

*Leasing Co.,* 401 F.2d 689, 692 (4th Cir.1968), *cert. denied,* 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969); *see also Levine v. Fairleigh Dickinson Univ.,* 646 F.2d 825, 833 (3d Cir.1981); *Home Ins. Co. v. Aetna Casualty & Sur. Co.,* 528 F.2d 1388, 1390 (2d Cir.1976). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other is necessarily justified. *Rains v. Cascade Indus., Inc.,* 402 F.2d 241, 245 (3d Cir.1968); *Bataco Indus., Inc. v. United States,* 29 Fed. Cl. 318, 322 (1993), *aff'd,* 31 F.3d 1176 (Fed. Cir.1994). The court must evaluate each party's motion on its own merit, taking care to draw all reasonable inferences against the party whose motion is under consideration. *Mingus Constructors, Inc.,* 812 F.2d at 1391.

In the above-captioned case, the parties have provided the court with a number of stipulations of fact along with extensive documentation attached to the pleadings, and agree that summary judgment disposition is appropriate. No issues have been identified by the parties or the court which raise material issues of disputed fact, therefore, this case is ripe for summary judgment.

Plaintiffs' motion for summary judgment claims that the Corps' final decision prevents any economically viable use of the submerged lands at issue. The plaintiffs state that the denial of the dredge and fill permit effectively prohibits Palm Beach Isles from making any use of the property. Moreover, the plaintiffs contend that the parcel at issue is solely the 50.7 acres of submerged land retained by the plaintiffs, after the sale of 261 acres of upland to Shell Oil Company in 1968, and not the 311.7 acre parcel composed of both submerged and upland as originally purchased by the plaintiffs in 1956.

Defendant moved for summary judgment arguing that the plaintiffs have no compensable expectancy in 49.3 acres of submerged land existing below the mean high water mark due to the navigational servitude rights of the United States. In addition, the defendant contends that the plaintiffs who acquired their interest after the enactment of the Clean Water Act have no compensable

expectancy to be free of governmental regulation. The defendant also contends that the plaintiffs cannot establish a taking claim under the traditional legal framework enunciated by the United States Supreme Court.[14] Defendant asserts that for the purposes of assessing the economic impact of regulation upon the plaintiffs' property, the 311.7 acre parcel in its entirety, as originally invested and purchased by the plaintiffs, must be considered.

The Takings Clause of the Fifth Amendment to the United States Constitution provides in pertinent part: "nor shall private property be taken for public use without just compensation." U.S. Const. amend. V. The purpose of the Fifth Amendment is "designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960). There is a "clear principle of natural equity that the individual whose property is thus sacrificed [for the public good] must be indemnified." *Pumpelly v. Green Bay & Mississippi Canal Co.,* 13 Wall. 166, 80 U.S. 166, 179, 20 L.Ed. 557 (1871).

■ There exists, however, no precise analytical framework or set formula for ascertaining exactly when the impact of a government regulation requires compensation by the government. *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). Determining whether a taking has occurred is an ad hoc factual inquiry that incorporates several factors identified by the Supreme Court as being particularly relevant and significant: (i) the character of the government action, (ii) the economic impact of the regulation, and (iii) the extent that the regulation interferes with reasonable investment-backed expectations. *Id.* at 124, 98 S.Ct. 2646; *Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 224, 225, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986). *See also Concrete Pipe & Products, Inc. v. Construction Laborers Pension Trust,* 508 U.S. 602, 643–47, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993); *United States v. Central Eureka Mining Co.,* 357 U.S. 155, 168, 78 S.Ct. 1097, 2 L.Ed.2d 1228 (1958).

■ The Supreme Court announced a *per se* rule in *Lucas v. South Carolina Coastal Council,* finding that a regulation depriving real property of all economic value would give rise to a taking without considering the other *Penn Central* factors delineated above. 505 U.S. 1003, 1029, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). The Supreme Court qualified this rule, however, with the exception that a total loss of value would not trigger a taking if "the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with...." *Id.* at 1027, 112 S.Ct. 2886. This "antecedent inquiry" into limitations that inhere in the owner's title is made by reference to state property or nuisance law. *See id.* at 1029, 112 S.Ct. 2886. The Supreme Court also emphasized that it is proper to "permit the government to assert a permanent easement that was a pre-existing limitation upon the landowner's title." *Id.* (comparing *Scranton v. Wheeler,* 179 U.S. 141, 163, 21 S.Ct. 48, 45 L.Ed. 126 (1900) with *Kaiser*

---

14. The defendant's papers also argue that Palm Beach Isles failed to establish ownership of the property on the date of the alleged taking. Initially, the plaintiffs filed a complaint solely in the name of Palm Beach Isles. The defendant challenged Palm Beach Isles' ownership of the property at issue, in pleadings submitted and at oral argument, arguing that Palm Beach Isles did not "own the property at the time of the permit denial." Subsequently, the complaint was amended to indicate that Palm Beach Isles maintained equitable title to the property at issue and to include parties with legal title to the property. Those parties pleaded to have legal title are Martin Slifka, individually and as trustee; Marjorie Margolis and Roberta Franklin, individuals as tenants in common; and the Estate of Joseph Slifka, represented by Alan Slifka and Barbara J. Slifka, co-executors. After repeated oral and written orders from the court, subsequent to the amended complaint, the parties submitted stipulations of fact defining the legal title ownership interests of the plaintiffs in the subject property since 1899. This submission, along with the amendment to the complaint defining the parties at interest, negates the bulk of defendant's argument that focused upon questions of established ownership; however, as discussed below, the questions of title are significant for the discussion regarding those individuals presumed to have knowledge of a regulatory scheme employed by the government.

*Aetna v. United States,* 444 U.S. 164, 178–80, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979)).

Subsequently, in *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984), the Supreme Court addressed a takings claim and focused on the reasonable investment-backed expectations prong of the *Penn Central* factors to deny a takings claim. *Id.* at 1005, 104 S.Ct. 2862. In that case, the Supreme Court relied upon the specific regulatory process that was in use by the government for evaluating data submitted to the government and found that the claimant could not validly expect that the data would be protected and not disclosed. *Id.* at 1013, 104 S.Ct. 2862. The Supreme Court, therefore, denied plaintiff's takings claim. *Id.;* see also *Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust,* 508 U.S. at 645–46, 113 S.Ct. 2264.

■ The navigable waters of the United States have long been considered "public property" and have thus been under the exclusive control of the federal government pursuant to the Commerce Clause of the United States Constitution. U.S. Const. art. I, § 8, cl. 3; *United States v. Rands,* 389 U.S. 121, 122–23, 88 S.Ct. 265, 19 L.Ed.2d 329 (1967); *Gilman v. Philadelphia,* 70 U.S. (3 Wall) 713, 724–25, 18 L.Ed. 96 (1865); *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824); *Owen v. United States,* 851 F.2d 1404, 1408 (Fed.Cir.1988). The power to regulate the navigable waters of the United States has been interpreted as bestowing upon the federal government a dominant estate in navigable waters below the mean high water mark and the lands underlying them. *United States v. Rands,* 389 U.S. at 122–23, 88 S.Ct. 265 (quoting *Gilman v. Philadelphia,* 70 U.S. (3 Wall) at 724–25); *United States v. Chicago, Milwaukee, St. Paul & Pac. R.R.,* 312 U.S. 592, 596–97, 61 S.Ct. 772, 85 L.Ed. 1064 (1941); *Scranton v. Wheeler,* 179 U.S. 141, 162–63, 21 S.Ct. 48, 45 L.Ed. 126 (1900); *Confederated Tribes of Colville Reservation v. United States,* 964 F.2d 1102, 1108 (Fed.Cir.1992); *Owen v. United States,* 851 F.2d at 1408. A navigational servitude may be asserted by the government to protect the public interest in navigable waters. See *Good v. United States,* 39 Fed.Cl. 81, 96

(1997) (noting that in *United States v. Ashland Oil and Transp. Co.,* 504 F.2d 1317 (6th Cir.1974), the "interests protected by servitude include protecting quality of navigable waters").

■ This federal "navigational servitude" inheres in a private landowner's title, and subordinates a property owner's interests to those of the federal government. See *Lucas v. South Carolina Coastal Council,* 505 U.S. at 1029, 112 S.Ct. 2886; *M & J Coal Co. v. United States,* 47 F.3d 1148, 1153 (Fed.Cir.), cert. denied, 516 U.S. 808, 116 S.Ct. 53, 133 L.Ed.2d 18 (1995); *Owen v. United States,* 851 F.2d at 1407–08. The Supreme Court in *United States v. Winstar Corporation,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), recently examined, in dicta, the navigational servitude doctrine in terms of the Takings Clause:

the navigational easement generally obviates the obligation to pay compensation at all. See, e.g., *United States v. Kansas City Life Ins. Co.,* 339 U.S. 799, 808, [70 S.Ct. 885, 94 L.Ed. 1277] (1950) ("When the Government exercises [the navigational] servitude, it is exercising its paramount power in the interest of navigation, rather than taking the private property of anyone"); *Scranton v. Wheeler,* 179 U.S. 141, 163, [21 S.Ct. 48, 45 L.Ed. 126] (1900) ("Whatever the nature of the interest of a riparian owner in the submerged lands in front of his upland bordering on a public navigable water, his title is not as full and complete as his title to fast land which has no direct connection with the navigation of such water. It is a qualified title . . . to be held at all times subordinate to such use of the submerged lands and of the waters flowing over them as may be consistent with or demanded by the public right of condemnation"). Because an order to pay compensation would have placed the Government in the same position as if the navigational easement had been surrendered altogether, . . .

518 U.S. at 879 n. 23, 116 S.Ct. 2432 (alterations in original).

These principles regarding the superior power of the government's navigational servitude have been applied in the United States

Court of Federal Claims to wetlands and submerged land takings case, as noted in *Good v. United States,* 39 Fed.Cl. 81 (1997):

> This limitation imposed by the servitude has been applied to deny a regulatory takings claim where the federal government proscribes the dredging and filling of submerged lands below the [mean high water mark], *Marks v. United States,* 34 Fed. Cl. 387, 403 (1995), *aff'd,* 116 F.3d 1496 (Fed. Cir.1997), [*reh'g denied in banc* suggestion declined (1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 852, 139 L.Ed.2d 753 (1998),] and deprives a private landowner of land values derived from access to navigable waters. *U.S. v. Rands,* 389 U.S. 121, 123–27, 88 S.Ct. 265, 266–69, 19 L.Ed.2d 329 (1967); *Owen,* 851 F.2d at 1410.

39 Fed.Cl. at 96–97 (footnote omitted). As the Court of Appeals for the Federal Circuit explicitly stated in *Owen v. United States,* "the government's navigational servitude can also serve to restrict certain uses of riparian land within the bed of a navigable stream that could affect navigation." 851 F.2d at 1409 n. 5 (citing *Lambert Gravel Co. v. J.A. Jones Constr. Co.,* 835 F.2d 1105 (5th Cir. 1988); *United States v. DeFelice,* 641 F.2d 1169 (5th Cir.1981)). It bears repeating that the Supreme Court has announced that it is permissible for "the government to assert a permanent easement that was a pre-existing limitation upon the landowner's title." *Lucas v. South Carolina Coastal Council,* 505 U.S. at 1029, 112 S.Ct. 2886. As the United States Court of Appeals for the Federal Circuit noted:

> Thus, even when a governmental land use regulation deprives a claimant of all economically beneficial use of his property, the government may avoid compensation if "the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with." *Lucas,* 505 U.S. at [1027], 112 S.Ct. at 2899; *cf. Penn Central,* 438 U.S. at 124–25, 98 S.Ct. at 2659–60. ("[T]he Court has dismissed 'taking' challenges on the ground that, while the challenged government action caused economic harm, it did not interfere with interests that were sufficiently bound up with the reasonable expectations of the claimant

to constitute 'property' for Fifth Amendment purposes.") (listing cases).

*M & J Coal Co. v. United States,* 47 F.3d at 1153.

Despite the fact that plaintiffs have not argued that section 111 of the Rivers and Harbors Act abrogates the government's supreme navigational servitude, it has been suggested that section 111 allows a compensation claim even in the wake of the application of the navigational servitude doctrine. However, section 111 provides:

> In all cases where real property shall be taken by the United States for the public use in connection with any improvement of rivers, harbors, canals, or waterways of the United States and in all condemnation proceedings by the United States to acquire lands or easements for such improvements, the compensation to be paid for real property taken by the United States *above the normal high water mark of navigable waters of the United States* shall be the fair market value of such real property based upon all uses to which such real property may reasonably be put, including its highest and best use, any of which uses may be dependent upon access to or utilization of such navigable waters. In cases of partial takings of real property, no depreciation in the value of any remaining real property shall be recognized and no compensation shall be paid for any damages to such remaining real property which result from the loss of or reduction of access from such remaining real property to such navigable waters because of the taking of real property or the purposes for which such real property is taken.

33 U.S.C. § 595a (1994) (emphasis added).

While section 111 modifies the doctrine articulated in *United States v. Rands,* to provide some compensation to a private landowner deprived of the value of land above the high water mark, the provision does not abrogate the navigational servitude generally, nor provide compensation for economic impacts attributable to the regulation of navigable waters, nor provide compensation for loss or reduction of access to navigable waters. *See* 33 U.S.C. § 595a; *United*

*States v. Rands,* 389 U.S. at 123–27, 88 S.Ct. 265; *see also United States v. 30.54 Acres of Land,* 90 F.3d 790, 796 (3d Cir.1996) (dismissing regulatory taking counterclaim in condemnation case on ground that prohibition on existing use below the mean high water mark falls within navigational servitude and was not a taking pursuant to section 111 of the Rivers and Harbors Act). The legislative history of section 111 provides that it "makes no change in existing law" concerning the application of the navigational servitude. H.R.Rep. No. 1665, 91st Cong.2d Sess. 31 (1970). Section 111 provides that in cases of partial takings, no depreciation in the value of remaining real property shall be paid the landowner. 33 U.S.C. § 595a. The Supreme Court has addressed the parameters of the navigational servitude as follows:

> This power to regulate confers upon the United States a "dominant servitude," *FPC v. Niagara Mohawk Power Corp.,* 347 U.S. 239, 249, [74 S.Ct. 487, 98 L.Ed. 666] (1954), which extends to the entire stream and the stream bed below ordinary high-water mark. The proper exercise of this power is not an invasion of any private property rights in the stream or the lands underlying it, for the damage sustained does not result from taking property from riparian owners within the meaning of the Fifth Amendment but from the lawful exercise of a power to which the interests of riparian owners have always been subject.

*United States v. Rands,* 389 U.S. at 123, 88 S.Ct. 265 (citing *United States v. Chicago, Milwaukee, St. Paul & Pac. R.R.,* 312 U.S. at 596, 61 S.Ct. 772; *Gibson v. United States,* 166 U.S. 269, 275–76, 17 S.Ct. 578, 41 L.Ed. 996 (1897)); *see Owen v. United States,* 851 F.2d at 1408; *see also Coastal Petroleum Co. v. United States,* 207 Ct.Cl. 701, 707–08, 524 F.2d 1206, 1210 (1975), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1770, 72 L.Ed.2d 174 (1982).

The United States Court of Appeals for the Federal Circuit has repeatedly held that, in light of the dominant interest in preserving the public right of navigation, the authority of the United States over navigable waters is "supreme." *Confederated Tribes of Colville Reservation v. United States,* 964 F.2d 1102, 1108 (Fed.Cir.1992) (citing *Gor-*

*don v. United States,* 211 Ct.Cl. 310, 311, 546 F.2d 430 (1976), *cert. denied,* 430 U.S. 930, 97 S.Ct. 1549, 51 L.Ed.2d 774 (1977)); *Goose Creek Hunting Club, Inc. v. United States,* 207 Ct.Cl. 323, 331, 518 F.2d 579, 583 (1975); *Sherrill v. United States,* 180 Ct.Cl. 914, 917, 381 F.2d 744, 745–46 (1967); *Marret v. United States,* 82 Ct.Cl. 1, 12, 1935 WL 2216, *cert. denied,* 299 U.S. 545, 57 S.Ct. 8, 81 L.Ed. 401 (1936). Furthermore, "the determination of the necessity for a given improvement of navigable capacity, and the character and extent of it, is for Congress alone." *United States v. Chicago, M., S.P. & P.R.R.,* 312 U.S. 592, 596, 61 S.Ct. 772, 85 L.Ed. 1064 (1941); *see also Owen v. United States,* 851 F.2d at 1408. "Land or property within the bed are always subject to (or burdened with) the potential exercise of the navigational servitude; thus, no compensation is owed when the government takes such land or property as the result of aiding the navigability of the stream." *Owen v. United States,* 851 F.2d at 1409 (footnote omitted) (citing *Tri–State Materials Corp. v. United States,* 550 F.2d 1, 6, 213 Ct.Cl. 1 (1977); *Goose Creek Hunting Club, Inc. v. United States,* 518 F.2d at 583, 207 Ct.Cl. at 331).

The Corps' permit for dredging and filling the property at issue was denied on May 16, 1990. The cover letter issued to the plaintiffs stated:

> The evaluation of your proposal has been completed and it has been determined that the issuance of the permit is contrary to the 404(b)(1) guidelines and contrary to the public interest. The project would result in the elimination of 50.7 acres of important Lake Worth shallow water habitat.

> Based on the evaluation of all pertinent facts in the file, the permit to fill 50.7 acres of Lake Worth shallow water habitat is hereby denied.

The Corps' Memorandum for the Record, date stamped May 16, 1990, regarding the Environmental Assessment and Statement of Finding for the Palm Beach Isles Associates Application was signed by Donald Borda, Senior Project Manager, and was reviewed and approved by two additional Corps officials. In responding to the dredge permit

application of Palm Beach Isles Associates on the issue of the elimination of navigable waters, the memorandum stated:

> (11) Navigation: Shallow water depths that already exist in the proposed project area have limited boating activities to shallow draft vessels. Therefore, other than the elimination of [49.3] acres of navigable waters, the project should not have a significant adverse impact on navigation, in general.

Subsequently, on December 21, 1994, after the above-captioned case was filed, Donald Borda, signed a written declaration that elaborated on these statements after reviewing the Environmental Assessment and Statement of Finding. After quoting the language on navigation noted above, Mr. Borda emphasized:

> It is important to clarify that I was referring, there, solely to navigation in the broad sense of the commercial or recreational vessels that utilize the adjacent federal navigation channel (Intracoastal Waterway) and that travel in deeper waters. While the proposed fill might not have a significant adverse effect upon the ability of such vessels to move in the federal channel (although it could cause some shoaling of the channel and/or changes in quantity, quality, and direction of flow of the waters), the proposed fill would certainly have an adverse effect on shallow draft vessels that utilize the shallower areas by eliminating over 49 acres of these shallows and by altering the course, location, condition, and capacity of [the] entire waterbody.

> The aforementioned statement ... should not be interpreted to mean that the proposed filling would not have a significant adverse impact on "navigable waters of the United States" under § 10 of the Rivers and Harbors Act of 1899 ("RHA"), 33 U.S.C. § 403, as defined in 33 C.F.R. Part 329. *The fill would, without doubt, have a significant adverse affect [sic] upon the entire waterbody by altering or modifying the course, location, condition, or capacity of the lake and the navigation channel, in violation [of the] RHA § 10.*

> *This is one of the principal reasons the permit was denied.*

(emphasis added).

It is clear to this court that the original denial referred to the "elimination of [49.3] acres of navigable waters." The subsequent affidavit affirms and clarifies the original statement by noting that, although the proposed fill would not have a "significant impact" directly upon the Intracoastal Waterway, it would certainly have a "significant adverse [e]ffect" on navigability of shallow draft vessels within the navigational servitude waters and upon the "course, location, and capacity of [the] entire waterbody" that is within the navigational servitude.

Therefore, the portion of plaintiffs' claim before this court that is below the mean high water line, which is located within the navigational servitude, and which was the subject of the dredge and fill permit application to the Corps, as authorized, under section 10 of the River and Harbor Act of 1899, 33 U.S.C. § 403, and section 404 of the Clean Water Act, 33 U.S.C. § 1344, creates no obligation on the part of the government to compensate plaintiffs pursuant to the Takings Clause of the Fifth Amendment to the United States Constitution. The portion of the defendant's motion for summary judgment arguing that there has been no taking of the plaintiffs' 49.3 acres of property below the mean high water mark within the navigational servitude, is, therefore, **GRANTED**.

The court, therefore, turns to an examination of the plaintiffs' takings claim for the remaining 1.4 acres of property that exist above the mean high water mark. However, prior to examining the takings claims on the 1.4 acres, the court will address ownership issues that are critical to the complete disposition of the remaining summary judgment issues currently before the court.

 It has long been held that proof of undisputed ownership of the property in question is a prerequisite to the prosecution of a Fifth Amendment taking claim. *See Cavin v. United States*, 956 F.2d 1131, 1134 (Fed.Cir.1992) (citing *United States v. Dow*, 357 U.S. 17, 20–21, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958); *Lacey v. United States*, 219

Ct.Cl. 551, 595 F.2d 614, 619 (1979)); *Yachts America, Inc. v. United States,* 779 F.2d 656, 662 (Fed.Cir.1985), *cert. denied,* 479 U.S. 832, 107 S.Ct. 122, 93 L.Ed.2d 68 (1986). Only the person or entity owning the property at the time of the taking is entitled to compensation. *See Lacey v. United States,* 595 F.2d at 619.

Although the history of the permitting process in the instant case appears straightforward, the factual record of transfers in the property interests is much more complex and murky. For a number of years after the case was filed, despite the court's urging, the plaintiffs were unable to produce documentation of the ownership interests. Finally, after submitting confusing records of ownership, the plaintiffs were able to produce information to allow the parties to stipulate as to the ownership interests at various milestone dates. As indicated in the Facts section of this opinion, on April 20, 1956, Frank Smith, Martin Slifka, and Joseph Slifka acquired a 311.70 acre parcel of property from the West India Fruit & Steamship Company for a total purchase price of $380,190.00.[15]

Subsequently, on June 18, 1957, Frank Smith, Martin Slifka, and Joseph Slifka, transferred a one-quarter interest in the 311.70 acre parcel of property to Morris Brown.[16]

On September 19, 1968, the four owners sold 261 acres of the original 311.7 acre parcel of property, excluding 49.3 acres of lake bottom and 1.4 acres of adjoining red mangrove/slat marsh cordgrass wetlands shoreline, to Shell Oil Company for approximately $1,000,000.00. Of the 50.7 acres retained by the owners, 49.3 acres are lake bottom below the mean high water mark and the remaining 1.4 acres of property are

---

15. It is interesting to note that Mr. Martin Slifka, upon questioning by government counsel, Mr. Joel Armstrong at a deposition on September 12, 1994, stated that a group of corporations had made the purchase:

Q. How did you first become familiar with Palm Beach Isles Associates?
A. Well, when we first purchased the property, we had a very different set-up. It was a group of corporations. And subsequently, we sold a piece of property, a piece of waterfront property to the south of the property in question. We then decided to form a partnership for the property in question.
Q. You said originally it was a corporation?
A. It was many corporations.
Q. Who owned those corporations?
A. The same partners.
Q. The same partners as who?
A. The same partners who own the property today.

\* \* \* \* \* \*

Q. You said a part of the property was sold, the waterfront—
A. All of it, all of this—all of the property owned by the corporations was sold completely.
Q. When did that occur?
A. In the neighborhood of 1969, plus or minus.
Q. Who purchased the property?
A. Myself and three other partners, myself and two other—correction, myself and two other partners purchased the property.

\* \* \* \* \* \*

Q. Mr. Slifka, can you describe for me when you first acquired the property at issue in this lawsuit?
A. Repeat the question.

Q. Can you tell me when you first acquired the property in this lawsuit and the circumstances surrounding that?
A. Yes, we acquired this property in 1956 from the West India Fruit & Steamship Co.
Q. You acquired it as a corporation? Was that when the group of corporations purchased the property, you said it was originally owned by a group of corporations earlier?
A. Yeah, but—yeah, yes, but the property was purchased in the name of three partners at that time.
Q. Who are those people?
A. Martin Slifka, Frank M. Smith and Joseph Slifka.

\* \* \* \* \* \*

Q. Who were the owners when you acquired the permit in 1957?
A. The four partners; Martin Slifka, Joseph Slifka, Morris Brown and Frank M. Smith.
Q. And they held the property as a corporation, or as a group of corporations at that time?
A. Yes.
Q. What were the names of the different corporations that they held?
A. The Pelican Corporation, the Heron Corporation, the Gulfstream Corporation. We had quite a few corporations, probably eight or nine, and each corporation owned a certain number of lots in that southern piece that I spoke about before we were called Palm Beach Isles.
Q. What about the northern piece that's in litigation now, did the corporations hold that property too, the corporations you just named?
A. Yes.

16. The deed recording this transfer does not specify a purchase price.

above the mean high water mark. In 1986, a partnership agreement was partially executed for Palm Beach Isles Associates.[17]

In the filings for summary judgment and at oral argument, defendant raised the issue of whether Palm Beach Isles Associates was an appropriate plaintiff, since it lacked ownership on the date of the alleged taking, May 16, 1990.[18] This court, at oral argument, ordered both parties to attempt to enter into joint stipulations and to produce documentation regarding the ownership interests of the individual plaintiffs at the relevant times in this case. The parties filed a joint submission a month later which failed to resolve the issue. Over a year later, the parties finally filed a stipulation of facts setting forth the "ownership interests in the subject property" at various times relevant to the instant action. According to the joint stipulation of the parties, as of the date of the permit denial by the Corps, May 16, 1990, the ownership interests in the property were: one-quarter interest held by Thelma Smith; one-quarter interest held by Martin Slifka; one-quarter interest held by Joseph Slifka; and one-quarter interest held by Pearl Brown, Ely Margolis and Gerald Franklin, as Trustees of Last Will and Testament of Morris Brown.[19] These later stipulations by the parties to this action as to the ownership interests in the property at issue render moot the government's argument that the plaintiffs failed to establish proper title and ownership.

17. Although plaintiffs claim that a partnership agreement was fully completed, this court has not yet seen any evidence of one. At Mr. Martin Slifka's September 12, 1994, deposition he stated the following, upon questioning by defendant's counsel, Mr. Joel Armstrong, concerning the Palm Beach Isles Associates partnership agreement:

Q. Can you give me an estimation now of the date of the formation?
A. I believe it was '89, something like that, '89, in that neighborhood that it was formed.
Q. Can I take a look at that document? ... This is labeled partnership agreement, is this the partnership agreement for Palm Beach Isles Associates?
A. Yes.
Q. Can I direct your attention to the signature page of the agreement? This copy has been signed by three people, is there a fully executed copy of this agreement?
A. Yes.
Q. Do you have a fully executed copy of the agreement with you?
A. No.
Q. Can you provide me with a copy, a fully executed copy?
A. Yes.
MR. TAYLOR: You'll get it in my office and I'll forward it up to the Government.
THE WITNESS: You want to make a note?
MR. TAYLOR: Yes, I've got it right up here in my head.
BY MR. ARMSTRONG:
Q. Mr. Slifka, do you recall the date on which the agreement was fully executed?
A. The day I signed it, it was not done on one single day because the partners were in—lived in different areas, so I signed it on a certain day and they signed it a little before and a little after.
MR. TAYLOR: Whatever date appears on the instrument, that will be the date it was signed by the individuals. Sometime in 1986.

18. Defendant notes that the partnership agreement for Palm Beach Isles Associates identifies a group of owners that differs from both the complaint and the executed deeds. Defendant points to a 1986 partially executed Palm Beach Isles partnership agreement, that lists the Palm Beach Isles Associates partners as the following people: Martin Slifka (32.5 percent), Marjorie Margolis (12.5 percent), Roberta Franklin (12.5 percent), Joseph Slifka (25 percent), Martin Greller (7.5 percent), J. Allen Yaeger, M.D. (5 percent), Jack Schiffman (2.5 percent), Estate of Charles E. Goldberg (2.5 percent).

Moreover, the precise nature of this partnership is somewhat questionable in that Mr. Slifka in his September 12, 1994 deposition stated that the partnership consisted of seven or eight partners. In addition, the plaintiffs alleged through a document attached to the original complaint that Palm Beach Isles Associates allegedly has thirteen members, comprised of the following: Marjorie Margolis, Martin M. Greller, Roberta Franklin, Richard Slifka, Robert Slifka, Joan Slifka, Joseph Slifka, Martin Slifka, Henry Slifka, Henry Yager, Paul Yager, Jack Schiffman, and Roy A. Hammer, all of whom do not correspond to those individuals to whom Martin Slifka apparently transferred a property interest in October of 1990.

19. It appears from documents attached to the defendant's motion for summary judgment that, in August 1986, Martin Slifka acquired Thelma Smith's one-quarter interest in the property for $1,500.00. However, for the purposes of this action, whether Martin Slifka or Thelma Smith owned the one-quarter interest that was originally owned by Frank Smith would not impact the result in this case because, as discussed below, either individual would have acquired their interest in the property after the Corps changed dredge and fill permit application regulations in the 1960s and early 1970s. In addition, Thelma Smith was not included as a party to this action.

Having addressed ownership issues, the court next addresses the takings claim that applies to the remaining 1.4 acres existing above the mean high water mark. The record reflects activity by the Corps which prevented plaintiffs from filling, not only those areas of the plaintiffs' property below the mean high water line subject to the exclusive servitude of the United States and for which the court finds no taking, but also the 1.4 acres above the mean high water line. A permit denial, however, does not necessarily mean that an unconstitutional taking has occurred under the facts and circumstances of a particular case. In order to assert a Fifth Amendment taking claim pursuant to the Tucker Act, 28 U.S.C. § 1491, a "claimant must concede the validity of the government action which is the basis of the taking claim to bring suit under the Tucker Act, 28 U.S.C. § 1491." *Tabb Lakes, Ltd. v. United States,* 10 F.3d 796, 802 (Fed.Cir.1993). In other words, to assert a taking claim, the government must have had the authority to regulate the proposed activity. The rationale is that:

a "Tucker Act suit does not lie for an executive taking not authorized by Congress, expressly or by implication." *NBH Land Co. v. United States,* 576 F.2d 317, 319, 217 Ct.Cl. 41 (1978); *see Southern Cal. Fin. Corp. v. United States,* 634 F.2d 521, 523, 225 Ct.Cl. 104 (1980), *cert denied,* 451 U.S. 937, 101 S.Ct. 2016, 68 L.Ed.2d 324 (1981)("[B]efore a compensable taking can be found by the court, there must be some congressional authorization, express or implied, for the particular taking claimed.").

*Tabb Lakes, Ltd. v. United States,* 10 F.3d at 802.

There is sufficient uncontested evidence in the record of the instant case to demonstrate that there was a legitimate state interest in preserving the quality of water for both ecological and navigational reasons within the area impacted by plaintiffs' development plan. The evidence in the record establishes that the land at issue is an integral part of the immediate ecological and navigable environment and that the activity proposed by the plaintiffs in their permit application could adversely effect Lake Worth and the Intracoastal Waterway. Such evidence is demonstrative of a legitimate state interest. *See Deltona Corp. v. United States,* 228 Ct.Cl. 476, 657 F.2d 1184, 1187 (Ct.Cl.1981), *cert. denied,* 455 U.S. 1017, 102 S.Ct. 1712, 72 L.Ed.2d 135 (1982).

Plaintiffs claim that the basis of defendant's denial of the dredge permit was solely the Clean Water Act. Plaintiffs claim that although landowners are on notice that all property is subject to regulation, when the regulation so restricts the potential use of the property so as to deny the owner of all economically viable use, a taking has occurred. Defendant responds that the dredge and fill permit application denial is authorized upon both the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, and the Clean Water Act, 33 U.S.C. § 1344.

A takings claim is assessed under guidelines established by the United States Supreme Court that have evolved, as discussed above, into an ad hoc factual inquiry premised upon *Penn Central* factors and the *per se* rule announced in *Lucas. See Lucas v. South Carolina Coastal Council,* 505 U.S. at 1029, 112 S.Ct. 2886 (finding that regulation depriving property of all economic value is a taking unless proscribed property interests were not inhered in the property's title); *Penn Central Transp. Co. v. New York City,* 438 U.S. at 124, 98 S.Ct. 2646 (delineating factors of character of government action, economic impact of regulation, and extent to which regulation interferes with reasonable investment-backed expectations).

In cases such as the one at bar, the reasonable investment-backed expectations factor of the *Penn Central* test limits recovery to property owners who can demonstrate that their investment was made in reliance upon the non-existence of the challenged regulatory regime. In part, the rationale for this rule is that "one who buys with the knowledge of a restraint assumes the risk of economic loss." *Creppel v. United States,* 41 F.3d at 632 (citing *Concrete Pipe & Products, Inc. v. Construction Laborers Pension Trust,* 508 U.S. at 645–46, 113 S.Ct. 2264; *Loveladies Harbor v. United States,* 28 F.3d 1171, 1177 (Fed.Cir.1994)). This inquiry is in-

formed not only by whether the specific regulatory restrictions at issue were in place at the time of purchase, but also by the regulatory climate at that time, and whether plaintiffs' investment expectations in purchase and development can be considered objectively reasonable in light of the regulatory climate.

The owner who buys with knowledge of a restraint can be said to have no reliance interest, or to have assumed the risk of any economic loss. *Loveladies Harbor, Inc. v. United States*, 28 F.3d at 1177; *see Ciampitti v. United States*, 22 Cl.Ct. 310, 321–22 (1991) (landowner who purchased wetland with knowledge of the regulatory structure and with warning that the requisite permit was "virtually impossible to get" had no reasonable investment-backed expectations).

This issue of knowledge of a regulatory restraint was specifically addressed by *Deltona Corp. v. United States*, 657 F.2d 1184, 228 Ct.Cl. 476. In *Deltona Corp. v. United States*, our predecessor court, the United States Court of Claims, gave background on the Corps' implementing regulations pursuant to statutory authority, specifically under the Clean Water Act and the Rivers and Harbors Act, and stated:

> The *implementing regulations* adopted by the Corps of Engineers pursuant to its statutory authority have grown increasingly complex and rigorous since the late 1960's. This, for us, is the key legal event in the case at bar.

> Until 1968, the Corps administered the Rivers and Harbors Act solely in the interest of navigation and the navigable capacity of the nation's waters. However, on December 18, 1968, in response to a growing national concern for environmental values and related federal legislation, the Corps revised its regulations to implement a new type of review termed "public interest review." Besides navigation, the Corps would consider the following additional factors in reviewing permit applications: fish and wildlife, conservation, pollution, aesthetics, ecology, and the general public interest.

> On April 4, 1974, the Corps published further revised regulations so as to:

> a) incorporate new permit programs under Section 404 of the FWPCA;

> b) incorporate the requirements of new federal legislation by adding to the factors to be weighted in the public interest review, including: economics; historic values; flood damage prevention; land-use classification; recreation; water supply and water quality;

> c) adopt further criteria to be considered in the evaluation of each permit application, including the desirability of using appropriate alternatives; the extent and permanence of the beneficial and/or detrimental effects of the proposed activity; and the cumulative effect of the activity when considered in relation to other activities in the same general area;

> d) institute a full-fledged wetlands policy to protect wetlands subject to the Corps' jurisdiction from unnecessary destruction.

*Deltona Corp. v. United States*, 657 F.2d at 1187–88 (emphasis original). *Deltona v. United States* is a case of particular interest to the instant action because it involves a takings claim brought by a Florida developer prohibited from completing a multi-phase development intended to be built upon land to dredged and filled out of wetlands.

The court in *Deltona Corp. v. United States* found that at the time the plaintiff in *Deltona* acquired its property in 1964, it knew that its development was contingent upon obtaining the necessary permits from the Corps of Engineers. *Id.* The court found that although there was an expectation that the permits would issue, a taking is not established by simply showing "that they have been denied the ability to exploit a property interest that they heretofore had believed was available for development." *Deltona Corp. v. United States*, 657 F.2d at 1193 (quoting *Penn Central Transp. Co. v. City of New York*, 438 U.S. at 130, 98 S.Ct. 2646). The court recognized that "*[t]he implementing regulations* adopted by the Corps of Engineers pursuant to its statutory authority have grown increasingly complex and rigorous since the late 1960's." *Deltona*

*Corp. v. United States,* 657 F.2d at 1187 (emphasis original). The denial of the permit based on the regulations subsequent to the purchase of the property, however, was found not to be sufficient to find a taking. *Id.* at 1193.

Dredging and filling operations have, in fact, been subject to federal oversight since the Rivers and Harbor Act was enacted in 1899 in which such activities are prohibited without a permit issued from the federal government. *See* 33 U.S.C. § 403. By the late 1960s, the Corps' review of permits, applied for pursuant to the Rivers and Harbor Act, took into consideration not only navigation, but also other environmental concerns such as fish and wildlife, conservation, pollution, aesthetics, ecology and the general public interest. 33 C.F.R. § 209.120(d) (1968).

Prior to the purchase by the plaintiff in the instant action of the subject property, the Corps was implementing these broad review standards to evaluate Rivers and Harbor Act permits for activities such as those proposed by plaintiffs, including the filling of wetlands and the connection of canals inland of the mean high water mark to navigable waters. *See Deltona Corp. v. United States,* 657 F.2d at 1187. In *Zabel v. Tabb,* 430 F.2d 199 (5th Cir.1970), *cert. denied,* 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808 (1971), for example, the Fifth Circuit rejected a developer's challenge to the Corps denial in 1967 of a Rivers and Harbor Act permit to fill tidal wetlands in Boca Ciega Bay, Florida, based upon ecological concerns. *Id.* at 202; *see also United States v. Sexton Cove Estates, Inc.,* 526 F.2d 1293, 1298 (5th Cir.1976) and *Weiszmann v. U.S. Army Corps of Engineers,* 526 F.2d 1302, 1303–05 (5th Cir.1976) (both holding that no taking occurs when the Corps required permitting of dredging for canals landward of the mean high water mark).

The enactment of the Clean Water Act in 1972 broadened the federal government's authority over the nation's waters, making it unlawful to discharge pollutants into those waters except by permit. 33 U.S.C. § 1311(a). The Clean Water Act placed the authority to regulate discharges of dredged or fill material in the Corps, 33 U.S.C. § 1344(a), and provided the Environmental Protection Agency with review authority over ecological and environmental issues related to permitting decisions. 33 U.S.C. § 1344(c). Shortly after the passage of the Clean Water Act, the Environmental Protection Agency implemented regulations to protect wetland ecosystems, which are impacted by dredging and filling practices. 38 Fed.Reg. 10,834 (May 2, 1973).

Plaintiffs' claim that the denial of the 1989 permit application prevented their "ability to exploit a property interest that they heretofore had believed was available for development." *Deltona Corp. v. United States,* 657 F.2d at 1193 (quoting *Penn Central Transp. Co. v. New York City,* 438 U.S. at 130, 98 S.Ct. 2646). The original purchasers bought the property at issue in 1956. Although the Corps granted a permit to fill the land in 1957, and subsequently extended it through December 31, 1963, the plaintiffs elected not to utilize the time-limited permit at that time and, thus, allowed their rights, to dredge and fill the property, to expire, just as the Corps and the federal government started to change the scope of dredge and fill permitting requirements. Moreover, in 1968, the plaintiffs sold off that portion of the property not subject to increased regulatory activity, including most of the lands that were above the mean high water mark other than a 2000 foot strip of 1.4 acres along the highway. In 1989, and after decades of regulatory change, the plaintiffs submitted another permit application, which the Corps denied on May 16, 1990, and which is at issue in this case. Plaintiffs argue they have been denied all economically beneficial use of their land despite the fact that in 1968, the parties had a reasonable return on their investment, from their purchase price of $380,190.00 to the sale price of approximately $1,000,000.00, and they still retained acreage. In addition, the plaintiffs cannot avoid the fact that they knew any future dredging and filling of wetlands was contingent upon the application of a permit and approval of the same, and knew that the act of applying for permitting does not create an assumption that a permit will be granted. *See United States v. Riverside*

*Bayview Homes, Inc.*, 474 U.S. 121, 126–27, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985).

Defendant notes that all the Palm Beach Isles partners, with the exception of Martin Slifka in his individual capacity, acquired their interests after enactment of the Clean Water Act (as well as the Rivers and Harbors Act) and after the broadening of the regulatory requirements. Because the 1.4 acres of land at issue is an integral part of the ecological and navigational environment, and the activity at issue could have a negative impact on the area, plaintiffs should have had no compensable expectancy to be free from its regulatory scheme.

The United States Supreme Court has written that "[j]ust as everyone is charged with knowledge of the United States Statutes at Large, Congress has provided that the appearance of rules and regulations in the Federal Register gives legal notice of their contents. 49 Stat. 502, 44 U.S.C. § 307." *Federal Crop Insur. Corp. v. Merrill*, 332 U.S. 380, 384–85, 68 S.Ct. 1, 92 L.Ed. 10 (1947). Similarly, this court's predecessor, the United States Court of Claims, noted that "[p]ublication of rulings and regulations in the Federal Register is notice to all of the world." *Lynsky v. United States*, 130 Ct.Cl. 149, 153, 126 F.Supp. 453, 455 (1954).

The reasonable investment-backed expectations factor of the *Penn Central* test limits recovery to property owners who can demonstrate that their investment was made in reliance upon the non-existence of the challenged regulatory regime. In part, the rationale for this rule is that one who invests in property with the knowledge of a restraint assumes the risk of economic loss. *Creppel v. United States*, 41 F.3d at 632; *Loveladies Harbor, Inc. v. United States*, 28 F.3d at 1177. Critical to this analysis is whether the specific regulatory restrictions at issue were in place at the time of purchase, but also relevant is the regulatory climate at the time of purchase, and whether plaintiffs' investment expectation in purchasing and developing the property can be considered objectively reasonable in light of the regulations and that climate.

When claimants purchase property, with knowledge of, or are deemed to know of, statutory and regulatory restraints, they do not have a reliance interest and they assume the risk of loss. *Loveladies Harbor, Inc. v. United States*, 28 F.3d at 1177; *see Ciampitti v. United States*, 22 Cl.Ct. at 321–22 (landowner who purchased wetland with knowledge of the regulatory structure and with warning that the requisite permit was "virtually impossible to get" had no reasonable investment-backed expectations).

"If a regulation categorically prohibits all economically beneficial use of land—destroying its economic value for private ownership—the regulation has an effect equivalent to a permanent physical occupation," and without more is a compensable taking. *Florida Rock Indus., Inc. v. United States*, 18 F.3d at 1564–65 (emphasis original). Therefore, the economic impact factor alone may be determinative in some circumstances, and no balancing of factors would be required. *Id.* at 1564 (citing *Lucas v. South Carolina Coastal Council*, 505 U.S. at 1028–31, 112 S.Ct. 2886). "If, however, a regulation prohibits less than all economically beneficial use of the land and causes at most a partial destruction of its value, the case does not come within the Supreme Court's 'categorical' taking rule." *Florida Rock Indus., Inc. v. United States*, 18 F.3d at 1565. Determination of whether there has been a partial or total loss of economic use, a categorical or *per se* taking, depends on what specific property was affected by the permit denial. *Loveladies Harbor, Inc. v. United States*, 28 F.3d at 1180–81.

In *Florida Rock Indus., Inc. v. United States*, the United States Court of Appeals for the Federal Circuit remanded the case to the trial level court "since loss of economic use and value is the issue in this regulatory taking case, it is not possible, absent a valid determination in the record of the 'after imposition' value of the land, to know if a taking occurred, much less what the Government must pay for it." *Florida Rock Indus., Inc. v. United States*, 18 F.3d at 1573. Whether a partial taking occurred depends on "the legal import of the final fair market value before and after the regulatory imposition on the particular property involved." *Loveladies*

*Harbor, Inc. v. United States,* 28 F.3d at 1180.

> If the tract of land that is the measure of the economic value after the regulatory imposition is defined as only that land for which the use permit is desired, that is the easiest case for those arguing that a categorical taking occurred. On the other hand, if the tract of land is defined as some larger piece, one with substantial residuary value independent of the wetlands regulation, then either a partial or no taking occurred, depending on the test as described in *Florida Rock,* 18 F.3d at 1567 *et seq.* This is the denominator problem.

*Loveladies Harbor, Inc. v. United States,* 28 F.3d at 1180.

Therefore, the instant case presents issues for discussion under the economic impact factor, namely the denominator determination, discussed in *Penn Central Transp. Corp. v. New York City,* which concerns the size and severability of the parcel in juxtaposition to the evolution of a regulatory environment that impacted upon the property. The defendant argues that a "parcel cannot be regarded as functionally divisible into discrete segments." The Supreme Court in *Penn Central Transp. Corp. v. New York City,* in often cited language, states that:

> "Taking" jurisprudence does not divide a simple parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and the nature and extent of the interference with rights in the parcel as a whole ...

*Id.* at 130–31, 98 S.Ct. 2646.

In the instant case, the defendant correctly argues that the parcel to be considered is not the 50.7 acres in dispute, but rather the original 311.7 acres. The Court of Appeals for the Federal Circuit stated in *Loveladies Harbor, Inc. v. United States* that, "precedent displays a flexible approach, designed to account for factual nuances when evaluating a particular fact pattern to determine parcel size and severability." 28 F.3d at 1181 (discussing *Deltona Corp. v. United States,* 228

Ct.Cl. 476, 657 F.2d 1184; *Whitney Benefits, Inc. v. United States,* 926 F.2d 1169 (Fed.Cir. 1991), *cert. denied,* 502 U.S. 952, 112 S.Ct. 406, 116 L.Ed.2d 354 (1991)). The court in *Loveladies Harbor, Inc. v. United States* held that the factual nuances include consideration of the timing of transfers in light of the developing regulatory environment, and upheld the trial court conclusion, based on facts in the record, that land developed or sold before the regulatory environment existed should not be included in the denominator. *Loveladies Harbor, Inc. v. United States,* 28 F.3d at 1181. This court concludes that, in the case at bar, the logical converse of this analysis is that the property sold after the regulatory structure was imposed, the 261 acres, should be included in the denominator for the purposes of assessing the critical property at issue.

On April 20, 1956, Frank Smith, Martin Slifka, and Joseph Slifka acquired a 311.7 acre parcel of property, including the 50.7 acres at issue in this action, from the West India Fruit & Steamship Company for a total purchase price of $380,190.00. On September 19, 1968, the four owners sold 261 acres of the 311.7 acre parcel of property, excluding 49.3 acres of lake bottom and 1.4 acres of adjoining red mangrove/salt marsh cordgrass wetlands shoreline, to Shell Oil Company for approximately $1,000,000.00. As discussed above, at the time of the sale, the plaintiffs knew that their permit for dredging and filling had expired and they were aware of the permit process and the need for a permit. Moreover, plaintiffs sold off the portion of the parcel not subject to permitting after the Corps started to enforce a broader regulatory scheme in accord with the River and Harbors Act of 1899. While plaintiffs attempt to argue that the denial of the dredge and fill permit was premised solely on the Clean Water Act, which was not passed until 1972, the record reflects that the denial of the plaintiffs permit was authorized by both navigational and environmental concerns under both the Rivers and Harbors Act and the Clean Water Act. In addition the parties have stipulated that on May 31, 1989, the Army Corps of Engineers received the permit application pursuant to section 10 of the

Rivers and Harbors Act of 1899, 33 U.S.C. § 401–467, and section 404 of the Clean Water Act, 33 U.S.C. § 1251–1387. The record is clear that the Corps denied Palm Beach's permit application on May 16, 1990, pursuant to both acts.

Regarding the character of the government action, the United States Supreme Court summarized the current judicial approach and its origin, as follows:

> "Harmful or noxious use" analysis was, in other words, simply the progenitor of our more contemporary statements that "land-use regulation does not effect a taking if it 'substantially advance[s] legitimate state interests' . . ." *Nollan [v. California Coastal Com'n,* 483 U.S. 825], *supra,* at 834 [107 S.Ct. 3141, 97 L.Ed.2d 677 (1987)] (quoting *Agins v. Tiburon,* 447 U.S., [255] at 260 [, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980)]; *see also Penn Central Transportation Co.,* 438 U.S., at 127 [, 98 S.Ct. 2646]; *Euclid v. Ambler Realty Co.,* 272 U.S. 365, 387–388 [, 47 S.Ct. 114, 71 L.Ed. 303] (1926)).

*Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1023–24, 112 S.Ct. 2886, 120 L.Ed.2d 798 (citations omitted). "That the purpose and function of the regulatory imposition is relevant to drawing the line between mere diminution and partial taking should not be read to suggest that when Government acts in pursuit of an important public purpose, its actions are excused from liability." *Florida Rock Indus., Inc. v. United States,* 18 F.3d at 1571. After *Lucas v. South Carolina Coastal Council,* "the question" is "whether, under controlling law, the regulatory imposition goes beyond the Government's powers under common law nuisance doctrine, and thus constitutes a taking." *Loveladies Harbor, Inc. v. United States,* 28 F.3d at 1179, 1182. Subsequently, the United States Court of Appeals for the Federal Circuit wrote:

> the character of the government action—examines the challenged restraint under the lens of state nuisance law. If the regulation prevents what would or legally could have been a nuisance, then no taking occurred. The state merely acted to protect the public under its inherent police powers. *Lucas v. South Carolina Coastal*

*Council,* [505] U.S. [1003], [1028–30] 112 S.Ct. 2886, 2900, 120 L.Ed.2d 798 (1992). Here the courts must inquire into the degree of harm created by the claimant's prohibited activity, its social value and location, and the ease with which any harm stemming from it could be prevented. *Id.* If state nuisance law does not justify the restraint, the court must proceed to the remaining criteria.

*Creppel v. United States,* 41 F.3d at 631.

Based on the facts presented in *Loveladies Harbor, Inc. v. United States,* the landfill project in a permit denial case was found not to constitute a nuisance under state law. 28 F.3d at 1182. In particular, the court in *Loveladies Harbor, Inc. v. United States* found that where the state had already "agreed as a result of negotiations conducted in the shadow of the state law suit" that the plaintiff could fill the property at issue, "[i]t would be inequitable to allow the state, through the medium of the federal permit process, to now exercise authority to prevent the fill, an authority which it publicly acknowledged it either did not have or was unwilling to exercise." *Loveladies Harbor, Inc. v. United States,* 28 F.3d at 1182. In addition, in *Bowles,* the court held that, where the government had not argued that the proposed lot use constituted a nuisance under state law, it was "unnecessary for the court to extensively address the nuisance issue as in prior cases." *Bowles v. United States,* 31 Fed.Cl. 37, 51 (1994) (citing *Florida Rock Industries, Inc. v. United States,* 21 Cl.Ct. 161, 167 (1990), *vacated and remanded on other grounds,* 18 F.3d 1560 (Fed.Cir. 1994); *Loveladies Harbor, Inc. v. United States,* 15 Cl.Ct. 381, 389 (1988)).

An examination of the character of the government action in the above-captioned case demonstrates that the permit denial by the government did impact on the plaintiffs' stated intention to develop the land. However, the regulatory permit requirements do not, *per se,* amount to a regulatory taking, unless the regulatory action goes "too far." *Tabb Lakes, Ltd. v. United States,* 10 F.3d at 800. "[W]hile property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *767 Third*

*Ave. Assoc. v. United States,* 48 F.3d 1575, 1580 (Fed.Cir.1995) (citing *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922)). As stated by the Supreme Court in *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 126–27, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985):

> Moreover, we have made it quite clear that the mere assertion of regulatory jurisdiction by a governmental body does not constitute a regulatory taking.... A requirement that a person obtain a permit before engaging in a certain use of his or her property does not itself "take" the property in any sense: after all, the very existence of a permit system implies that permission may be granted, leaving the landowner free to use the property as desired. Moreover, even if the permit is denied, there may be other viable uses available to the owner. Only when a permit is denied and the effect of the denial is to prevent "economically viable" use of the land in question can it be said that a taking has occurred.

*Id.*

In *767 Third Avenue Associates v. United States,* 48 F.3d at 1580, the court noted that:

> To analyze whether a regulation goes so far as to constitute a taking, the Supreme Court has indicated that there is no set formula; the determination depends upon the particular circumstances of the case. *Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659. "Ordinarily, the Court must engage in 'essentially ad hoc, factual inquiries.'" *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 426, 102 S.Ct. 3164, 3171, 73 L.Ed.2d 868 (1982) (quoting *Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659).

As discussed immediately above, the record in the instant case does not establish a *per se* taking and demonstrates that plaintiffs, despite their takings claim, still profited significantly from their investment as a result of the sale of the 261 acre piece of the property. The takings clause in the Constitution should not be construed to provide a windfall to claimants in light of the known regulatory permitting requirements or the selling off of valuable portions of a parcel by the plaintiffs and their retention of only those acres subject to regulation.

The following discussion in *Ciampitti v. United States* regarding a definition of the parcel to be considered in the type of case currently at issue is particularly relevant:

> before it can be determined whether the permit denial had the effect of taking all economically viable use of the property, the property has to be defined. In *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 497, 107 S.Ct. 1232, 1248, 94 L.Ed.2d 472 (1987), and *Penn Central Transp. Co.,* 438 U.S. at 130–31, 98 S.Ct. at 2662, the Court focuses the inquiry on the "parcel as a whole." Admittedly, in those cases the Court was not directly dealing with a governmental contention that additional land ought to be included in the calculus. Instead, the question was whether certain rights within a "bundle" of rights could be segregated and viewed separately. That same analysis may not always be appropriate in weighing the Government's contention that the analysis should be broadened to include other property held by the plaintiff, but in the court's view, it fits here.
>
> In the case of a landowner who owns both wetlands and adjacent uplands, it would clearly be unrealistic to focus exclusively on the wetlands, and ignore whatever rights might remain in the uplands. If a governmental entity required a buffer, for example, around a housing development, a court would not entertain a separate claim for the land dedicated to buffer. It would no doubt take into consideration the extent to which the whole parcel could be developed. Factors such as the degree of contiguity, the dates of acquisition, the extent to which the parcel has been treated as a single unit, the extent to which the protected lands enhance the value of remaining lands, and no doubt many others would enter the calculus. The effect of a taking can obviously be disguised if the property at issue is too broadly defined. Conversely, a taking can appear to emerge if the property is viewed too narrowly. The effort should be to identify the parcel as realistically and fairly as possible, given

the entire factual and regulatory environment.

22 Cl.Ct. at 318–319.

In discussing *Deltona Corp. v. United States,* the court in *Ciampitti v. United States* noted that the parcel to be considered consisted of "not only those areas as to which dredge and fill permits were denied, but also those areas that had been successfully developed earlier." *Ciampitti v. United States,* 22 Cl.Ct. at 320. The instant action presents a similar picture. Perhaps most telling is the discussion in *Ciampitti v. United States* regarding the implications of severing the parcel into discrete segments despite prior gains on some portions:

> It would be inappropriate to allow [the developer, Ciampitti,] now to sever the connection he forged when it assists in making a legal argument. Ciampitti is, in effect, asking to isolate the least valuable portion of the purchase when he himself saw the parcels as inextricably linked in September 1983. The court concludes that "the parcel as a whole" must, in this case, include those uplands purchased . . .

*Ciampitti v. United States,* 22 Cl.Ct. at 320.

In the above-captioned case, it is a fact that the plaintiffs garnered approximately $1,000,000.00 for the sale of 261 acres of the parcel in 1968, on an original investment of approximately $380,000.00 in 1956 for a parcel of 311.7 acres. Given that the original investors recouped on their investment, coupled with the property owners realistic, minimal expectations regarding "the absorption rate" of the submerged acreage upon development, the court is concerned that plaintiffs would gain a windfall where they have already profited. In addition, the Corps specifically did not suggest that the plaintiffs could not develop the property at all and the original permit application to the State of Florida upon denial also emphasized that a "design incorporating features resulting in minimal environmental impact such as docks and boardwalks, could be pursued." In keeping with the cases in this circuit, it is apparent that the parcel to be considered in the instant action should be the original purchase acreage of 311.7 acres, and that the plaintiffs have already achieved a significant return on their investment. The plaintiff asks the court to examine this alleged taking in a microcosm, and not as a 311.7 acre parcel, although it is apparent that the sale of 261 acres of beachfront upland in 1968, in the midst of well-publicized regulatory changes, significantly impacted the value of the remaining submerged acreage parcel and the plaintiffs' intent to develop those acres for another twenty years. Plaintiffs realistic expectations also should have been impacted by the fact that they allowed the dredge and fill permit for the lands at issue to expire, when they knew or should have known that they would be required to reapply for a permit. A permit, by its very nature, is never guaranteed, since the act of applying indicates the possibility of denial.

Once the property below the mean high water mark is disposed of as legally outside the realm of the takings clause, there remains a parcel of some 1.4 acres of wetlands, extending over 2000 linear feet alongside a highway and Lake Worth. This 1.4 acres is not a discrete segment, but must be assessed as part of an entire parcel, that consists of either 311.7 acres, as originally purchased by related investors, or as part of the 50.7 acres that the plaintiffs retain at this date. Even if the court were to consider only the 50.7 acre parcel retained at present by the plaintiffs, the remaining 1.4 acres at issue are not subject to a government taking.

It is apparent from the record that the 1.4 acres of wetland shoreline, independent of the 49.3 acres subject to the navigational servitude, could not support a housing development project, let alone a single house, and, thus, would be of minimal value, either pre- or post-government regulation, for the stated purposes of Palm Beach Isles. This conclusion, that the property has minimal pre-government regulation value also is supported by documentation that in August of 1986, prior to the denial of the dredge and fill application by the Corps, Martin Slifka paid $1500.00 to Thelma Smith for her one-quarter interest in the entire 50.7 acre parcel. (This payment stands in contrast to the $10,000,000.00 claimed by the plaintiffs as damages for their taking claim for the entire 50.7 acre parcel.) Plaintiffs' posture, given the facts presented, is akin to those presented to the court in *Ciampitti v. United States,* 22

Cl.Ct. at 322, which noted how the plaintiff in *Ciampitti* perhaps had gone beyond the concept of reasonable investment-backed expectations into the realm of "unreasonable."

The plaintiffs have not been denied access to navigable waters, nor has the government taken the plaintiffs' upland property for public use under the authority of the Rivers and Harbors Act, 33 U.S.C. § 595a. In addition, the plaintiffs still have the right to apply for a permit from the Corps and a zoning variance from the state and local authorities that would allow for water dependent uses for the 50.7 acre parcel. The court also notes that any valuation of the economic impact of the regulation upon the plaintiffs' property must consider whether other viable development options have not been explored by the plaintiffs. The court, therefore, finds that the regulations at issue do not in and of themselves categorically deny the plaintiffs all beneficial use of their land, nor did the Corps' permit denial undermine reasonable investment-backed expectations on the part of the plaintiffs.

### CONCLUSION

The plaintiffs' claim for a taking under the Fifth Amendment of the United States Constitution is not viable in that the navigational servitude removes from the takings inquiry some 49.3 acres of the plaintiffs' property within the navigational servitude waters below the mean high water mark. In addition, the plaintiffs' claim for the remaining 1.4 acres is not a *per se* taking of land when the entire parcel of either 311.7 acres or 50.7 acres is considered. Moreover, the plaintiffs did not and do not have a reasonable investment-backed expectation of the value of this 1.4 acres when assessed in the context of the expectation for the entire parcel, of which 49.3 acres are subject to the navigational servitude, and of which 261 acres were sold for a substantial gain. Therefore, the court, hereby, **DENIES** plaintiffs' motion for summary judgment, and **GRANTS** defendant's cross-motion for summary judgment.

**IT IS SO ORDERED.**